RAUH *v.* FLETCHER SAVINGS & TRUST COMPANY ET AL.

[No. 26,006.   Filed February 25, 1935.]

*Charles Remster, Henry H. Hornbrook, Albert P. Smith, Paul Y. Davis,* and *Kurt F. Pantzer,* for appellant.

*James W. Noel, Hubert Hickam, Alan W. Boyd,* and *Robert D. Armstrong,* for appellees.

TREANOR, J.—This action was brought under the Uniform Declaratory Judgments Act (Acts 1927, ch. 81, p. 208; §3-1101, *et seq.* Burns Ind. St. Ann. 1933) to obtain a declaration of the rights of appellant and appellee under a contract dated Nov. 4, 1926, whereby appellant had agreed to sell and appellee's decedent, Leo Kahn, had agreed to buy certain shares of the capital stock of the American Sanitary Lock Corporation.

Errors assigned are (1) the overruling of a demurrer to the complaint and (2) the overruling of motion for new trial.

The first assignment of error presents the single proposition that the Uniform Declaratory Judgments Act is unconstitutional. It is contended that the act confers upon the courts jurisdiction over non-judicial matters in violation of Art. III, §1[1] and Art. VII, §1[2] of the Indiana Constitution.

While this court has had before it cases in which suit was commenced under the Uniform Declaratory Judgment Act, in none of these was the constitutionality of the Act passed upon. In *Zoercher* v. *Agler* (1930), 202 Ind. 214, 221, 172 N. E. 186, 70 A. L. R. 1232, the validity of the Act was assumed by both parties, but this court was required to decide whether plaintiff's complaint stated a cause of action for a declaration of rights under the Act. We quote the following:

"It is also true under the Uniform Declaratory Judgments Acts (now in effect in more than 20

Note 1. "The powers of the government are divided into three separate departments: the legislative, the excutive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this constitution expressly provided." Art. III, §1, Ind. Const.

Note 2. "The judicial power of the state shall be vested in a Supreme Court, in circuit courts, and in such other courts as the general assembly may establish." Art. VII, §1, Ind. Const.

states, III Ind. Law Jour. 353) that the person bringing the action must have a substantial present interest in the relief sought, such as there must exist not merely a theoretical question or controversy but a real or actual controversy, or at least the ripening seeds of such a controversy, and that a question has arisen affecting such right which ought to be decided in order to safeguard such right."

The state courts regularly have rejected the contention that a declaratory judgment act attempts to confer non-judicial functions upon the courts, whenever the questions which can be submitted under the act are within the limits set in *Zoercher* v. *Agler, supra*. But the Supreme Court of the United States has held that the judicial power vested in United States courts extends only to "cases" and "controversies" which were recognized as justiciable at the time of the adoption of the United States Constitution. The view of the United States Supreme Court as it affects suits for declaratory judgments is well expressed by the following:

"But still the proceeding is not a case or controversy within the meaning of article 3 of the Constitution. The fact that the plaintiff's desires are thwarted by its own doubts, or by the fears of others, does not confer a cause of action. No defendant has wronged the plaintiff or has threatened to do so. Resort to equity to remove such doubts is a proceeding which was unknown to either English or American courts at the time of the adoption of the Constitution, and for more than half a century thereafter, . . ." *Willing* v. *Chicago Auditorium Association* (1928), 277 U. S. 274, 72 L. Ed. 880.

Earlier United States Supreme Court decisions also have been relied upon for the proposition that a declaratory judgment is not a judicial judgment for the reason that it does not give consequential relief. The following statement from *Gordon* v. *United States* (1864), (117 U. S. 697) does support the proposition:

"The award of execution is a part, and essential part, of every judgment passed by a court exercising judicial power; there is no judgment, in the legal sense of the term, without it."

But later decisions of the Supreme Court of the United States make clear that there may be a judicial judgment without consequential relief.

"The Federal courts have rendered opinions adversely to the validity of declaratory judgment acts, but it has recently been held that, while ordinarily a case for judicial controversy results in a judgment requiring the award of process of execution to carry it into effect, such relief is not an indispensable adjunct to the exercise of the judicial function. *Fidelity Nat. Bank & T. Co.* v. *Swope* (1927), 274 U. S. 123, 71 L. ed. 959, 47 S. Ct. 511 (approved in *Old Colony Trust Co.* v. *Commissioner of Internal Revenue* (1929), 279 U. S. 716, 73 L. ed. 918, 49 S. Ct. 499) ; *Nashville, C. & St. L. R. Co.* v. *Wallace* (1933), 288 U. S. 249, 77 L. ed. 730, 53 S. Ct. 345. . . .

" 'Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution, whether the subject of the litigation be property or status.' "[3]   87 A. L. R. 1210.

The Constitution of Indiana does not define "judicial power" and nowhere limits the functions of courts to hearing and deciding cases and controversies. Consequently our problem is not one of construing language but of determining whether a court is acting judicially in declaring "rights, status and other legal relations" as authorized by the Uniform Declaratory Judgments Act. We think it is clear that under the Indiana Declaratory Judgments Act the cases which may be considered by the courts are not moot and do not call for merely advisory opinions.

*Note 3.*   *Tutun* v. *United States*, 270 U. S. 568, 70 L. ed. 738, 46 S. Ct. 425; *Fidelity Nat. Bank* v. *Swope, supra.*

"A moot case is imaginary. It does not exist in fact; to decide it serves no useful purpose—nothing is adjudicated, so nothing is affected. Whereas a declaratory judgment must always deal with a real dispute of a real fact. An advisory opinion is merely a giving of advice, it is not binding." Ind. Law Jour. Vol. III, No. 5 (Feb. 1928) p. 357.

Furthermore under our act the declaration of rights is a final judgment, not only in form but in effect; and as between the parties to the proceeding and their privies, in the absence of appeal, it constitutes an adjudication upon the subject matter presented.[4]

We are in accord with the holdings in other jurisdictions that rendering a declaratory judgment is none the less an exercise of judicial power even though it does not carry with it, by force of the judgment itself, consequential relief. We quote with approval and adopt as expressing our own views the following:

"While the legislature obtains legislative power and the courts receive judicial power by grant in the state Constitution, the whole of such power reposing in the sovereignty is granted to those bodies, except as it may be restricted in the same instrument. There is no constitutional restriction on the power of the legislature to recognize the complexity of modern affairs, and to provide for the settlement of controversies between citizens without the necessity of one committing an illegal act or wronging or threatening to wrong the other. There is no constitutional expression of limitation upon the power of the court to decide such disputes. . . . When an actual controversy exists between parties, it is submitted in formal proceedings to a court, the decision of the court is binding upon the parties and their privies and is *res adjudicata* of the issue in any other proceeding in court in which it may be involved. What else can the decision be but the exercise of judicial power?" *Washington-Detroit Theatre Co.* v. *Moore* (1930), 249 Mich. 673, 229 N. W. 618, 68 A. L. R. 105.

*Note 4.* Declaratory Judgments Act *(supra)*, especially §§1, 6, 7, 8 and 9.

"Turning to the function or duty imposed by our Declaratory Judgment Act upon the Superior Court as set forth above, could it be claimed with any pretense of reason, that the function was legislative or executive? The answer is obvious. We must, then, conclude that the function is judicial, or that it falls outside of the three functions described as legislative, executive or judicial. It would be a travesty to hold that this method of remedial justice could find no place in our system of government unless a place was made for it by an amendment to the Constitution. Such, of course, is not the fact, as the case of *Dawson* v. *Orange,* 78 Conn. 96, 61 Atl. 101, discloses. We are not, therefore, required to hold that under our Constitution the General Assembly is forbidden to enlarge our customary method of remedial justice by authorizing the novel mode of judicial procedure of permitting courts to render declaratory judgments, and thus to close the door to the use in this state of a method of judicial procedure which, for more than a ˙half century, has been used to the great benefit of the commonwealth and people by those using kindred methods of jurisprudence as in Great Britain. To hold that the judicial power of this State is confined to the consideration of cases where consequential relief only is sought, would be enforcing a limitation upon the judicial power in accord with custom rather than with reason and logic." *Braman* v. *Babcock* (1923), 98 Conn. 549, 120 Atl. 150.

We hold that the Declaratory Judgment Act is constitutional and that the facts alleged in the complaint state a cause of action for a declaration of rights under the contract.

The contract involved was one that was to be performed subsequently to the performance of a contract, made on Nov. 7, 1925, referred to as the "primary" contract, and concerning which the following allegations of appellee's complaint is undisputed:

"That prior to the 7th day of November, 1925, 314 shares of the stock of said corporation were

owned by the following persons in the amounts set opposite their respective names, to wit:

| | |
|---|---|
| Samuel E. Rauh | 179 shares |
| David Lurvey | 110 shares |
| Ralph Knode | 10 shares |
| Charles S. Rauh | 15 shares |

"That on said date said stockholders last above named entered into a contract in writing with said American Sanitary Lock Corporation and said defendant as Trustee, whereby said stockholders agreed to sell their 314 shares of stock in said corporation at par plus interest at the rate of six per cent per annum from the date of their respective purchases of said stock, the same to be paid for out of the earnings of said corporation from time to time as therein provided, and upon payment in full of said purchase price the same were by the terms of said contract to be the property of said defendant; . . ."

The contract of Nov. 4, 1926 is, in part, as follows:

"Whereas, Charles S. Rauh is now the owner of 420 shares of the capital stock of American Sanitary Lock Corporation and expects to own 314 additional shares after a certain agreement executed by Samuel E. Rauh, David Lurvey, Ralph Knode, American Sanitary Lock Corporation, Charles S. Rauh, Trustee, and Charles S. Rauh, individually, on the 7th day of November, 1925, hereinafter called the 'Primary Contract,' has been fully performed; and

"Whereas, said Charles S. Rauh desires to sell and Leo Kahn desires to purchase the stock so owned or to be owned by the said Rauh upon the terms hereinafter stated;

"Now therefore, it is agreed as follows:

"(1) When and as soon as said Primary Contract has been fully performed by American Sanitary Lock Corporation said Rauh shall cause to be issued in the name of Leo Kahn, a stock certificate for the 314 shares of the capital stock of American Sanitary Lock Corporation acquired by said Rauh under the terms of the aforementioned Primary Contract.

"(2) Said Leo Kahn shall thereupon immediately endorse in blank said certificate for 314 shares and place same in the hands of Charles S. Rauh to be

held by said Rauh as collateral to guarantee the payment by Kahn to Rauh of the purchase price of 420 shares of the capital stock of American Sanitary Lock Corporation belonging to said Rauh.

"(3) Said Rauh agrees to sell and said Kahn agrees to purchase of the said Rauh, the aforesaid 420 shares of stock for the sum of Forty-two Thousand Dollars ($42,000.00) plus interest at six per cent (6%) per annum on 46 shares figured from date of issue, December 19, 1923.

"(4) Said purchase price is to be paid to said Rauh at the rate of One Thousand Dollars ($1,000.00) per month beginning on the first day of the calendar month next following notification by Rauh to Kahn that the Primary Contract has been fully performed, and continuing until full payment has been made. Any payment not made when due shall bear interest at the rate of six per cent (6%) per annum from date until paid.

"(5) Upon the payment by Kahn to Rauh of each monthly installment of One Thousand Dollars ($1,000.00), Rauh shall cause to be issued to said Kahn a certificate of stock for 10 shares until such time as the shares of stock remaining in Rauh's hands, including the 314 shares deposited with Rauh as collateral by Kahn, shall equal 604 shares representing approximately fifty-one per cent (51%) of the total outstanding capital stock of American Sanitary Lock Corporation; i. e., Eleven hundred eighty-five (1185) shares."

\* \* \* \* \*

"(8) Until full performance of this agreement by the said Kahn, but until said Rauh shall have become entitled to terminate this agreement as hereinbefore provided all dividends declared on said stock and received by said Rauh as holder thereof shall be applied as follows: dividends on forty-six (46) shares to be paid to Rauh and dividends on 314 shares to be credited to the purchase price. In addition thereto there shall also be applied thereon and credited to the purchase price all monies received by Rauh in payment of salaries as reflected by the books of account of American Sanitary Lock Corporation. All such dividends and salaries shall first be applied and credited to the payment of any interest then due hereunder, and second to the pay-

ment of the oldest installments of principal due and unpaid in order of their maturity, any surplus to the last maturing of the installments of principal thereunder.

"(9) Payments made by the said Kahn, other than dividends on the stock herein agreed to be sold, shall be credited and applied, first to payment of any interest due thereunder, second to the payment of matured installments of principal in the order of their maturity, and third to the next maturing installments of principal in order of maturity, it being understood that subject to the order of payment hereinbefore fixed, said Kahn shall have the privilege of prepaying any part of said principal."

Appellant paid no cash consideration for the 420 shares of stock which he contracted to sell to Kahn, but it was acquired by Rauh as consideration for endorsing a note of the corporation in the sum of $40,000.00 payable to Fletcher American National Bank. He also endorsed renewals of the note from time to time until it was finally paid in full in September, 1927. From March 1, 1924, until March 1, 1928, appellant's salary as an officer of the corporation was $50.00 per week; from March 1, 1928, until March 1, 1929, he was paid $500.00 per month and was paid an additional $600.00 on adjustment of salary for January and February, 1928, to the $500.00 per month scale.

The trial court construed section (8) of the contract to require that all salary received by appellant Rauh, both before and after the execution of the contract, be credited on the purchase price. Appellant contended that no salary received prior to the completion of the primary contract should be applied as a credit; and alternatively, that no salary received prior to the execution of the contract in suit (Nov. 4, 1926) should be so applied. We find no ambiguity in the statement "there shall also be applied thereon and credited to the purchase price *all monies*

*received by Rauh in payment of salaries as reflected by the books of account of American Sanitary Lock Corporation."* There is not a single word to indicate an intention to distinguish between salaries received by Rauh before and after the date of the secondary contract. "All monies received by Rauh in payment of salaries" are to be credited on the purchase price and the amount is to be determined by consulting the books of account of the corporation without restriction as to any particular period. Exhibits Nos. 5-a, 5-b and 5-c are sheets taken from the books of account of the American Sanitary Lock Corporation which, under the heading "Executive Salary, Chas. S. Rauh," carry an itemized statement of "all monies received by Rauh in payment of salaries," beginning with a payment in January, 1924, and running through February, 1929. Both parties were familiar with the books of account of the corporation and, at the time of the execution of the secondary contract, they knew that "monies received by Rauh in payment of salaries" were reflected by the books of the corporation in the sum of $6,950. Since, with knowledge of the foregoing, the parties used language in section (8), which by its normal and obvious meaning, requires this sum of $6,950 to be credited upon the purchase price we must conclude that they intended that it should be so applied, unless other provisions of the contract expressly negative this intention, or unless the parties by subsequent conduct have indicated an intention to modify the provisions of section (8).

Appellant urges that the foregoing construction of section (8) conflicts with the provision of section (3) which prescribes a purchase price of $42,000 plus 6 per cent interest on 46 shares. Appellant's point being that "if salary received prior to the execution of the contract is nevertheless to be credited against the pur-

chase price, then the real purchase price in the beginning was $35,050 and not $42,000 as prescribed in section (3). But section (3) is clear and complete within itself and does not trench upon the provision of section (8). Section (3) contains the primary sale-and-purchase agreement, identifies the subject of the sale (420 shares of stock) and fixes the sale value ($42,000) of the subject and fixes the total obligation of the purchaser at $42,000 plus interest at six per cent (6%) per annum on 46 shares figured from date of issue, Dec. 19, 1923." Section (8) does not purport to fix the purchase price but deals only with dividend and salary credits which the purchaser was entitled to have applied to the purchase price. Evidently the parties preferred to fix the total money obligation in section (3) and to treat all "monies received as salaries" as credits on the purchase price. As suggested by appellee "the reasonable presumption is that the parties wished the purchase price to appear in the contract as the par value of the stock with certain additions and subtractions to be made subsequently."

Appellant further contends that the construction adopted by the trial court is unreasonable because "it attributes to the parties the intent to give appellant Rauh the benefit of these salary payments if for any reason the primary contract should not be performed, but to deprive him of them if the contract should be performed, whereas it does not appear that the performance of the primary contract would in any way subtract from the value of the services which were the primary consideration of the salary or from the value of the stock, but would on the contrary increase the value of both, thus placing a penalty on the happening of a condition which was prima facie cause for an increased award."

The trial court's construction of the contract does not

carry the foregoing implication. It is true that failure to perform the primary contract would have entitled appellant to keep the salary received as well as the stock, but it is not at all clear that this could have been considered more advantageous to him than to receive $42,000 for his 420 shares, plus certain interest, less the amount of monies received as salary. In fact it must have been contemplated that non-performance of the primary contract would most likely result, if at all, from failure of earnings, in which event appellant would be deprived of a sale of his stock at the price named and the value of the stock would be lessened. Certainly we cannot say that appellant did not think it would be more advantageous to himself to sell his stock for $42,000 less all monies received as salary than to have the stock and keep the "monies received as salaries" in case of default of Kahn.

Appellant urges that "wherever there is doubt as to whether a phrase in a contract is to operate prospectively or retrospectively, the doubt must be resolved in favor of prospective operation," citing *Bartlett* v. *Wheeler* (1901), 96 Ill. App. 342, which contains the following statement:

"Undoubtedly a contract may have a retrospective operation. Whether it has or not is to be determined from the contract itself. Where the words of an executory contract are susceptible of two meanings and there is no evidence arising from surrounding circumstances to throw light upon the intention of the parties, the more reasonable inference is that the contract was with reference to what was to take place after its making."

The excerpt quoted states a correct rule of law. But the provisions of the contract do not create any doubt as between prospective and retrospective operation. Credit is to be given for "all monies received by Rauh in payment of salaries" without limitation as to time of

receipt. Performance of the contract by the parties was not conditioned upon Rauh's having received moneys in payment of salaries prior to or subsequent to the execution of the secondary contract. The crediting clause of section (8) is equally applicable whether moneys were received as salaries before or after the execution of the contract or not at all.

Upon completion of the primary contract the salary of Rauh was increased to $500.00 a month and Kahn's salary was increased $500.00 a month. Appellant sees in this an intention "to provide means to permit the purchaser, if he so desired, to withdraw from the assets of the corporation a sufficient sum to discharge the instalment payments, as and when they matured"; and also an indication that salary payments were not considered important until the completion of the primary contract. The salary increases did provide a means of meeting the monthly instalments of $1,000.00 out of the earnings of the corporation; but the fact that these increases were made shortly after the completion of the primary contract does not justify the conclusion that the parties did not consider salary payments to Rauh important prior to the completion of the primary contract. An obvious reason for not increasing salaries during the lifetime of the primary contract is found in the fact that all available earnings of the corporation were being applied to the purchase of the block of 314 shares of stock; and the discharge of the primary contract depended upon the payment of the purchase price of these shares.

Appellant insists that the words "payments made by said Kahn, other than dividends on the stock herein agreed to be sold," (§9, *supra,* p. 5) must include payments by salary credits; and that, under the further provision of §9 authorizing these payments to be applied "to next maturing installments of principal in order of

maturity," a conflict is created between §§8 and 9. Appellant's contention involves the following assumptions:

(a) That "payments made by Kahn" as used in §9 of the contract includes "(1) payments by Kahn from his personal funds" (2) "payments by way of dividends" and (3) "payments by way of salaries to Rauh."

(b) That the effect of the language "payments made by Kahn, other than dividends on the stock herein agreed to be sold" means that the clause deals with (1) payments by Kahn from his personal funds and (3) payments by way of salaries to Rauh.

(c) That to construe the language "payments made by Kahn other than dividends," etc., as not referring to salaries is to make the words "other than dividends" wholly meaningless.

(d) That in view of the foregoing assumption, there is a conflict between §§8 and 9 of the contract in that the latter section would allow the application of surplus salaries to the *next* maturing installment, instead of the *last* maturing installments.

Appellant apparently assumes that "dividends on the stock herein agreed to be sold" (§9) refers to the dividends on the 314 shares which are referred to in §8. If that were true it would be difficult to avoid the inference that the term "payments" in §9 was intended to include monies received as salaries as well as cash payments. But the stock "herein agreed to be sold" included only the 420 shares; (§§2 and 3, *supra,* p. 5) and as soon as Kahn paid for any of these 420 shares he became the owner of them and would be entitled to the dividends thereon in his own right. It is not unreasonable to assume that the parties thought of these dividends if applied to the purchase price as essentially the same as cash payments from the personal funds of Kahn. On the other hand the "credits" consisting of dividends on the 314 shares and of monies received as

salaries by Rauh, in a very substantial sense, were not payments by Kahn; and we can understand why the parties thought of them as credits on the purchase price, rather than as payments by Kahn. The 314 shares were purchased from the earnings of the company and Kahn's full ownership of them was contingent upon his performing the secondary contract. Also, Rauh's salaries came directly out of the income of the company.

In view of the foregoing it is not necessary to construe "payments" in §9 to include the credits for salaries or dividends on the 314 shares (§8); and we must avoid such a construction, if it is not unreasonable to do so, in order to give effect to the unqualified provisions of §8. And considering §§8 and 9 together it can be reasonably said that the parties did not intend to include either salary payments or dividends on the 314 shares in the term "payments" as used in §9. And, consequently, the fact that the parties did not utilize salary payments to prepay installments of principal does not indicate an understanding that "monies received by Rauh in payment of salaries" prior to the completion of the primary contract were not to be credited upon the purchase price.

We are impressed with the soundness of the following observations of the trial court which are included in appellee's brief:

"In pure technical construction something can be said on both sides of the two contentions asserted. If, however, the court can draw from the clause in question the real intent of the parties without relying entirely upon a rather limited or narrow technical construction, it is his duty to do so.

"This contract develops something in the nature of a running account to be balanced or ended at such time in the future as one of the parties might assert and demonstrate that a full compliance of its terms had been had. Its terms contemplate a final adjust-

ment with certain contingencies in the future. In other words a final settlement can only be had after considering certain computations that involve the running of time. . . .

"If this evidence is fairly considered in connection with section 8 of the contract I do not see how the court could say that such salary should be viewed as a factor only from a date midway between the opening and closing of the 'books of account' any more than he could say—if it were so contended by plaintiff—that salaries, if any, paid prior to the beginning of those as shown by the 'books of account' should be credited upon the stock purchase."

As previously stated we believe that the clause "all monies received by Rauh in payment of salaries as reflected by the books of account of American Sanitary Lock Corporation" must include, by the normal and obvious effect of its language, all such "monies" irrespective of time of payment. We find nothing in other sections of the contract, nor in the circumstances as revealed by the evidence, to negative such meaning. Nor does the conduct of the parties, after the execution of the contract, indicate an intent to modify the provisions of section 8.

We conclude that the trial court's construction of §8 of the contract is a reasonable one, and that it gives effect to what, in view of the contract as a whole and the evidence of surrounding circumstances, must have been the actual intent of the parties.

The trial court did not err in overruling appellant's demurrer and in overruling his motion for new trial.

Judgment affirmed.