

# IN THE

# Indiana Supreme Court



**FILED**
Dec 15 2020, 8:39 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

Supreme Court Case No. 19S-PL-304

## Eric Holcomb, in his official capacity as Governor of the State of Indiana,
*Appellant (Defendant)*,

—v—

## City of Bloomington,
*Appellee (Plaintiff)*.

---

Argued: January 9, 2020 | Decided: December 15, 2020

Appeal from the Monroe Circuit Court,
No. 53C06-1705-PL-1138
The Honorable Frank M. Nardi, Special Judge

On Direct Appeal

---

**Opinion by Justice Goff**

Chief Justice Rush concurs.

Justice David concurs in result.

Justice Slaughter dissents with separate opinion in which Justice Massa joins.

**Goff, Justice.**

In 2017, the legislature passed a statute stopping Bloomington's proposed annexation of several areas of land and prohibiting the city from trying to annex the areas for five years. Bloomington, which had been in the process of educating and engaging the public about the proposed annexation but had not yet sought formal adoption of its plan, challenged the constitutionality of the statute in a declaratory judgment action against Governor Holcomb. The trial court ultimately found the statute unconstitutional. On appeal, the parties present us with two issues: (1) whether Bloomington can seek declaratory relief in this case from the Governor, and (2) whether the statute is unconstitutional.

First, we conclude that Bloomington can challenge the statute in this declaratory judgment action against the Governor. Because Bloomington has suffered an injury, and due to the unique way in which the statute was drafted, Bloomington's suit satisfies the requirements of a declaratory judgment action. Prudential concerns further compel us to reach the merits of this case.

Second, we conclude that the statute is unconstitutional special legislation in violation of Article 4, Section 23 of the Indiana Constitution because the legislature enacted a special law—one that targeted only Bloomington—when it could have enacted a law that applied generally throughout Indiana. We thus affirm the trial court on these issues.

## Factual and Procedural History

In early February 2017, Bloomington Mayor John Hamilton announced plans for a proposed annexation of several areas of land. He and his team then began the regimented, statutory process that they hoped would result in the City of Bloomington Common Council formally adopting ordinances annexing the land.

At a February 15 meeting, the City Council considered whether to adopt resolutions formally initiating the annexation process. Over the course of four hours, the City Council discussed the proposed annexation

of each area and heard from members of Mayor Hamilton's team, Monroe County officials, and members of the public. The City Council ultimately adopted the initiating resolutions.

As required by statute, city officials then published and mailed notices of six public-outreach meetings to be held in March at the Bloomington City Hall. Officials were available to answer questions at these "open-house format" meetings, and members of the public were invited to review additional information regarding the proposed annexation.

On March 29, the City Council considered whether it should formally introduce—but not yet adopt—the proposed annexation ordinances. Mayor Hamilton spoke in favor of the ordinances and, as at the February 15 meeting, the City Council also heard from members of the mayor's team, Monroe County officials, and members of the public. All told, the City Council spent over six hours at this meeting discussing and considering the introduction of the ordinances. It ultimately declined to introduce the ordinance proposing to annex an area northeast of Bloomington, but it introduced the other annexation ordinances.

Continuing to move through the steps in the statutory annexation process, city officials planned to hold a public hearing on May 31 in a high-school gym regarding the introduced annexation ordinances, and they hoped that the City Council would officially adopt the ordinances on June 30. But legislative developments would eventually put a stop to these plans.

While Bloomington was taking its initial steps toward annexation, the General Assembly passed legislation, codified at Indiana Code section 36-4-3-11.8 ("Section 11.8"), concerning the annexation plan. Section 11.8 cut off Bloomington's proposed annexation and prohibited Bloomington from trying to annex the same areas for the next five years.

In response, the City of Bloomington did not hold the planned public hearing on the annexation ordinances but instead brought this suit against the Governor, in his official capacity, seeking declaratory and injunctive relief. Specifically, Bloomington sought declarations that Section 11.8 constitutes special legislation that violates Article 4, Section 23 of the

Indiana Constitution and that Section 11.8 violates Article 4, Section 19's single-subject rule. The Governor sought to dismiss Bloomington's complaint, arguing that he was not a proper defendant because he does not enforce the statute, but the trial court denied the motion. Both parties eventually sought summary judgment. The trial court reiterated its prior finding that the Governor was a proper defendant; declared Section 11.8 unconstitutional under Article 4, Sections 19 and 23 of the Indiana Constitution; and entered summary judgment in favor of Bloomington.

The Governor filed a direct appeal, over which this Court has mandatory jurisdiction pursuant to Indiana Appellate Rule 4(A)(1)(b). We now affirm the judgment of the trial court.

## Standard of Review

The issues in this case—whether Bloomington can bring this declaratory judgment action against the Governor and whether Section 11.8 is unconstitutional—turn on legal questions such as the proper interpretation and application of statutes and constitutional provisions. *See City of Hammond v. Herman & Kittle Props., Inc.*, 119 N.E.3d 70, 78 (Ind. 2019); *City of Lawrence Utils. Serv. Bd. v. Curry*, 68 N.E.3d 581, 585 (Ind. 2017). "When 'the challenge to summary judgment raises questions of law, we review them de novo.'" *City of Lawrence Utils. Serv. Bd.*, 68 N.E.3d at 585 (citation omitted). However, a statute comes "clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *State v. Buncich*, 51 N.E.3d 136, 141 (Ind. 2016).

## Discussion and Decision

The annexation process generally involves three stages: (1) adoption of an annexation ordinance by a municipality's legislative body; (2) an opportunity for affected landowners to object to, or remonstrate against, the annexation; and (3) judicial review triggered by remonstrance. *Town of Fortville v. Certain Fortville Annexation Territory Landowners*, 51 N.E.3d 1195, 1197 (Ind. 2016). *See generally* Ind. Code ch. 36-4-3 (2017). Before a municipality can complete the first stage by adopting an annexation

ordinance, it must take a series of statutorily prescribed steps that include conducting an outreach program, introducing the ordinance, and holding a public hearing. I.C. § 36-4-3-1.7, I.C. § 36-4-3-2.1. In this case, Bloomington was moving through the steps toward ordinance adoption when the legislature passed the budget bill that codified Section 11.8.

Although the proposed annexation ordinances had not yet been adopted, the legislature intervened in the process by enacting Section 11.8 to stop Bloomington's—and only Bloomington's—proposed annexation. The legislature achieved this purpose by first limiting the applicability of Section 11.8 so that it would apply to Bloomington's proposed annexation alone. *See* I.C. § 36-4-3-11.8(a)–(d) (limiting its applicability to certain annexation ordinances introduced between January 1, 2017 and June 30, 2017—when Bloomington's were introduced on March 29—that had not been adopted as of the statute's effective date of April 30, 2017). Then, the legislature declared that such an annexation ordinance falling within its scope—namely, Bloomington's—"is void and the annexation action is terminated." I.C. § 36-4-3-11.8(d). It further prohibited a municipality from taking "any further action to annex any of the property to which this section applies until after June 30, 2022, including introducing another annexation ordinance covering some or all of the property covered by this section." *Id.*

With Section 11.8 blocking Bloomington from moving forward with its proposed annexation, the parties raise the same two issues as before the trial court: whether the Governor is the proper defendant and whether Section 11.8 is unconstitutional. First, we conclude that, through no fault of the Governor's but because of the way the legislature drafted Section 11.8 and because of the prudential concerns involved, Bloomington can bring its declaratory judgment action against the Governor. Second, we conclude that Section 11.8 is unconstitutional special legislation in

violation of Article 4, Section 23 of the Indiana Constitution.[1] We address each conclusion in more detail below.

## I. Bloomington can bring this declaratory judgment action against the Governor.

In addressing whether the Governor is the proper defendant in this declaratory judgment action, we proceed in three parts. In Part I.A., we describe the Governor's specific argument challenging the justiciability of this suit and lay out the standard that controls this case. In Part I.B., we consider whether this case is nonjusticiable based on the Governor's argument that he does not enforce Section 11.8. In Part I.C., we determine whether this case is nonjusticiable due to prudential concerns. Ultimately, based on all this analysis, we conclude that this case is justiciable, and Bloomington can bring this declaratory judgment action.

### A. As a threshold matter, we need only consider the Governor's specific justiciability challenge to Bloomington's declaratory judgment action, not broad principles of standing.

The Governor's preliminary argument that he is not the proper defendant is a very specific, narrow attack on the justiciability of this case. He does not dispute Bloomington's injury; indeed, Bloomington has spent over $800,000 on the proposed annexation so far, but Section 11.8 precludes it from completing the annexation process. In fact, the Governor does not focus on Bloomington's ability to bring a suit at all. He instead focuses on Bloomington's ability to seek a declaratory judgment against **him**. Specifically, he argues that Bloomington cannot bring this declaratory judgment action against him because he does not enforce Section 11.8, so a judgment against him would not help Bloomington. To

---

[1] Because we find Section 11.8 unconstitutional under Article 4, Section 23, we do not consider Bloomington's argument regarding the statute's constitutionality under Article 4, Section 19.

address this narrow argument, we must first examine the requirements of a declaratory judgment action.

The Uniform Declaratory Judgments Act, as relevant here, allows a city "whose rights, status, or other legal relations are affected by a statute . . . [to] have determined any question of construction or validity arising under the . . . statute" via declaratory judgment. I.C. § 34-14-1-2. *See also* I.C. § 34-14-1-13 (including municipal corporations in the definition of a person who may obtain declaratory relief). While the Act "is to be liberally construed and administered," I.C. § 34-14-1-12, it does not open the courts to resolving theoretical cases; it still "requires a justiciable controversy or question." *Ind. Dep't of Environmental Management v. Twin Eagle, LLC*, 798 N.E.2d 839, 843 (Ind. 2003). To satisfy this requirement, it's enough that the "ripening seeds" of a controversy exist and that the plaintiff has "a substantial present interest in the relief sought." *Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*, 365 N.E.2d 752, 755 (Ind. 1977) (quoting *City of Mishawaka v. Mohney*, 156 Ind. App. 668, 297 N.E.2d 858, 860 (1973) (quoting *Zoercher v. Alger*, 202 Ind. 214, 172 N.E. 186, 189 (1930))).

Here, Bloomington has a substantial present interest in the declaratory relief it seeks because a declaration that Section 11.8 is unconstitutional would remove the statute as a barrier to its proposed annexation. But, if the Governor has no connection to Section 11.8, Bloomington's declaratory judgment action against him would lack even the ripening seeds of a controversy and Bloomington could not obtain relief from him. Accordingly, our task in addressing the Governor's argument that Bloomington cannot bring this suit against him boils down to one limited question: What connection does the Governor have to Section 11.8?

This case does not turn on broad principles of standing. Justiciability, in the context of declaratory judgment actions, merely requires that the "ripening seeds" of a controversy exist and that the plaintiff has "a substantial present interest in the relief sought." *Id.* This relaxed standard aligns with the purpose of declaratory judgment actions: "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." I.C. § 34-14-1-12. Here, Bloomington brought its declaratory judgment action seeking relief from uncertainty and insecurity

surrounding Section 11.8, and the Governor has raised a narrow challenge to the justiciability of the dispute based on his alleged lack of connection with the statute. None of this turns on broad principles of standing.

Keeping in mind the Governor's narrow justiciability argument, we consider the unique impact of annexation statutes like Section 11.8; analyze what the structure and application of Section 11.8 mean for its enforcement; and review the potential sources of the Governor's enforcement authority to see what, if any, connection the Governor has to the statute.

### B. The legislature drafted Section 11.8 in a unique way that vests enforcement authority in the Governor, and Bloomington can bring this declaratory judgment action against him because of it.

#### 1. Annexation is a unique area of law primarily dealing with public rather than private relations.

Our annexation statutes, including Section 11.8, represent a unique area of law. They provide a detailed process by which municipalities may try to expand their boundaries to incorporate adjacent territory with urban characteristics. *See City of Carmel v. Certain Southwest Clay Township Annexation Territory Landowners*, 868 N.E.2d 793, 796 (Ind. 2007). When a municipality annexes territory, no property changes hands and no private rights of landowners are affected. *Bradley v. City of New Castle*, 764 N.E.2d 212, 215 (Ind. 2002) (citation omitted). Rather, "the act simply changes the property and its owner, in their civil relation to certain public authority." *Id.* (quoting *Stilz v. City of Indianapolis*, 55 Ind. 515, 523 (1877)). These unique attributes distinguish annexation statutes from statutes that impact private rights or that do more than adjust civil relations to public authority, which some federal courts have determined cannot be challenged in a suit against a governor due to their impact on primarily private relations. *See, e.g.*, *Shell Oil Co. v. Noel*, 608 F.2d 208, 212 (1st Cir. 1979) (citing cases that rejected challenges to statutes that "determine[d]

the right of one private person to recover from another" or "set[] the jurisdictional requirements for divorce," among others). Since our annexation statutes, as a whole, represent a unique area of the law that primarily impacts public rather than private relations, the Governor's potential connection to Section 11.8 cannot be dismissed out of hand. This is true because of the unique powers and responsibilities vested in the office of the Governor by our state constitution.

### 2. Unlike other annexation statutes, the legislature did not tie Section 11.8's enforcement to remonstrances.

While annexations generally deal with public concerns, our annexation statutes provide a method—remonstrance—by which owners of property within the area to be annexed can challenge the annexation.[2] *See generally* I.C. §§ 36-4-3-11, -11.2, -11.3; I.C. § 36-4-3-13. The Governor argues that this statutory remonstrance process proves that property owners—not the Governor—enforce annexation laws, including Section 11.8. And in most cases, this argument would certainly carry the day. However, Section 11.8 is not and could not be tied to the statutory remonstrance process, so neither that process nor property owners control Section 11.8's enforcement.

On its face, Section 11.8 has no connection with the statutory remonstrance process. It contains no provision that conditions its application on the filing of a remonstrance petition. Instead, it flatly declares that any introduced annexation ordinance falling within its scope "is void and the annexation action is terminated." I.C. § 36-4-3-11.8(d). The lack of connection between Section 11.8 and the remonstrance process stands in stark contrast to other annexation statutes. The only other provision of our annexation law that declares an annexation ordinance void does so only if a certain percentage of affected landowners sign a written remonstrance petition. I.C. § 36-4-3-11.3(b). Similarly, the

---

[2] There are also other, limited ways to challenge an annexation. *See, e.g.*, I.C. §§ 36-4-3-15.5, -15.7. But neither party argues, and we do not find, that those methods are relevant here.

provision allowing affected landowners to appeal an annexation to a court requires a written remonstrance petition. I.C. § 36-4-3-11.3(c). The legislature clearly knows how to provide for enforcement of annexation statutes through the remonstrance process, but it did not do so with Section 11.8.

Even if we were to ignore the legislature's decision not to expressly condition enforcement of Section 11.8 on a remonstrance proceeding, interpreting Section 11.8 as being enforced through a remonstrance would conflict with Section 11.8's own language. Section 11.8 voids and terminates specific annexation ordinances that were introduced but not yet adopted. *See* I.C. § 36-4-3-11.8(b), (c), (d). Because Section 11.8 cuts off a proposed annexation before the municipality's legislative body has formally adopted the annexation ordinance, it understandably speaks in terms of terminating the annexation action. I.C. § 36-4-3-11.8(d) (declaring the introduced ordinance "void" and the annexation action "terminated"). But Section 11.8's focus on terminating an annexation before the ordinance has been adopted renders it incompatible with the remonstrance process because a remonstrance requires an adopted annexation ordinance. A remonstrance petition must include dated signatures of the remonstrators, and a remonstrator cannot sign a petition before the municipality's legislative body adopts the annexation ordinance being challenged. *See* I.C. § 36-4-3-11(d); I.C. § 36-4-3-11.2(c)(1), (e)(7); I.C. § 36-4-3-11.1(b), (c). In short, Section 11.8 halts a proposed annexation before the annexation ordinance has been adopted, precluding a remonstrance proceeding. Therefore, we cannot accept the argument that the primary method for enforcing Section 11.8 is in a remonstrance proceeding that Section 11.8 itself precludes. By decoupling Section 11.8 from the remonstrance process, the legislature showed that Section 11.8 is different even from the related statutes and normal procedures in the unique area of annexation law.

### 3. The Governor enforces Section 11.8 thanks to the combination of his broad constitutional duties and the statute's one-of-a-kind nature, so Bloomington can bring this suit.

Keeping in mind Section 11.8's uncommon characteristics, we turn to the specific question of whether the Governor plays a role in enforcing the statute and, thus, whether he can be sued in this declaratory judgment action. Bloomington supports its decision to bring its declaratory judgment action against the Governor with two main arguments: first, prior cases challenging the constitutionality of a statute in Indiana have included the Governor as a defendant;[3] and, second, the Constitution vests the Governor with the executive power of the State and obliges him to faithfully execute the law. The Governor disagrees, distinguishing precedent and arguing that his broad constitutional duties do not give him the ability to enforce Section 11.8. We agree with the Governor that the precedent cited by Bloomington does not control here, but we find that the Governor does enforce Section 11.8 thanks to the peculiar combination of his constitutional authority and the unique nature of Section 11.8.

As to Bloomington's first argument, prior cases do not address the specific issue here and do not control. Bloomington acknowledges, as it must, that Section 11.8 does not expressly confer duties on the Governor or any other executive branch officials but that the statutes at the heart of the precedent it cites did reference members of the executive branch. Br. of Appellee, pp. 30–31 n.10 (discussing *Stoffel v. Daniels*, 908 N.E.2d 1260,

---

[3] Bloomington primarily relies on the Court of Appeals opinion in *Stoffel v. Daniels*, 908 N.E.2d 1260 (Ind. Ct. App. 2009). But it also cites six cases from this Court. *See Bonney v. Ind. Fin. Auth.*, 849 N.E.2d 473 (Ind. 2006); *D & M Healthcare, Inc. v. Kernan*, 800 N.E.2d 898 (Ind. 2003); *State v. Nixon*, 270 Ind. 192, 384 N.E.2d 152 (1979); *Whitcomb v. Young*, 258 Ind. 127, 279 N.E.2d 566 (1972); *Welsh v. Sells*, 244 Ind. 423, 192 N.E.2d 753 (1963); *Orbison v. Welsh*, 242 Ind. 385, 179 N.E.2d 727 (1962).

1265, 1272 (Ind. Ct. App. 2009)).[4] As a result, Bloomington's cases did not involve the Governor as the sole defendant; instead, they primarily involved suits against the Governor and other executive branch officials referenced in the challenged statute. *See, e.g.*, *Bonney v. Ind. Fin. Auth.*, 849 N.E.2d 473 (Ind. 2006) (naming Governor Daniels, the Indiana Finance Authority, and the Indiana Department of Transportation, among others, as defendants). And none of the cases considered whether the Governor, specifically, should have been included as a defendant. *See, e.g.*, *Stoffel*, 908 N.E.2d at 1271–72 (considering whether the plaintiff properly sued a group of defendants, which included Governor Daniels and the Indiana Department of Local Government Finance). Ultimately, most of the cases Bloomington cites address situations when a plaintiff challenges a statute by suing the Governor along with other executive branch officials expressly referenced by the statute. But this case does not fit that mold, and Bloomington's precedent provides little help in determining whether Bloomington can seek declaratory judgment here.

So, we move on to Bloomington's second argument and consider how Section 11.8 might implicate the Governor's general constitutional power and authority. A state official's role in implementing or enforcing a statute can arise from the statute itself or the general law. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specifically created by the act itself, is not material so long as it exists.").[5] In most

---

[4] Although Bloomington cited it for support of its suit against the Governor, we exclude *Whitcomb v. Young* from this discussion of Bloomington's precedent. *Young* is distinguishable for another reason: the plaintiff sued Governor Whitcomb in his capacity as a member of the Indiana State Election Board to obtain an interpretation of a constitutional amendment. 258 Ind. at 130, 279 N.E.2d at 569. Here, by contrast, Bloomington sued the Governor in his official capacity as Governor to challenge a statute.

[5] Federal decisions in this area involve requirements that do not apply in Indiana state courts, *see* U.S. Const. art. III, § 2 (providing the case-or-controversy requirement); U.S. Const. amend. XI (limiting states' amenability to suit in federal court), so we cannot import their holdings directly into our analysis. However, the more general principles discussed by the federal courts apply equally in Indiana.

situations, the general law provides an insufficient connection between the Governor and enforcement of a particular statute to give rise to the ripening seeds of a controversy required for a declaratory judgment action. *See Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir.), *cert. denied*, 139 S. Ct. 126 (2018) (quoting *Shell Oil Co.*, 608 F.2d at 211) (stating, under the federal standard, that "[t]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in **every** action attacking the constitutionality of a state statute" (emphasis added)). But under rare circumstances, unique aspects of the statute combine with the general law to provide enforcement or implementation authority to the Governor. *See, e.g., Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665–66 n.5 (6th Cir. 1982) (finding Ohio's governor a proper defendant based on the Ohio Constitution and "the substantial public interest in enforcing" the challenged legislation despite "the absence of specific state enforcement provisions"); *HRPT Props. Trust v. Lingle*, 715 F. Supp. 2d 1115, 1127 (D. Haw. 2010) (finding Hawaii's governor a proper defendant based on her constitutional duty to faithfully execute the laws). This is one such rare case.

Our Constitution provides that "[t]he executive power of the State shall be vested in a Governor" who "shall take care that the laws are faithfully executed." Ind. Const. art. 5, §§ 1, 16. We have described these as broad, general provisions of authority and obligation in the Governor. *Tucker v. State*, 218 Ind. 614, 652–53, 656, 35 N.E.2d 270, 284, 286 (Ind. 1941). And these broad provisions of power and duty include those incidental powers and duties necessary to exercising executive power and carrying out the Governor's duties. *Id.* at 670–71, 35 N.E.2d at 291 (noting that the power to appoint subordinate officers to carry out laws was "a necessary incident to the power to execute the laws"). As a result, these provisions have been found to support a Governor's authority and duty to act to ensure the proper execution of laws, even absent specific statutory language directing the Governor to do so. *See Cato v. Chaddock*, 175 Ind. App. 514, 518, 373 N.E.2d 172, 175 (1978) (relying on the Governor's constitutional duty to faithfully execute the laws in affirming Governor Whitcomb's declaration of the effective date of the 1970 Census, despite finding no specific statutory authority for him to make such a declaration).

The two unique aspects of Section 11.8 discussed in Parts I.B.1. and I.B.2. above bring the Governor's executive authority and his faithful-execution duty into play here. **First**, as an annexation statute, Section 11.8 deals with citizens' "civil relation to certain public authority" rather than specific private rights. *Bradley*, 764 N.E.2d at 215 (quoting *Stilz*, 55 Ind. at 523). In other words, Section 11.8 impacts citizens' civil relationship to counties, cities, towns, and the like—all subdivisions of the State. *See, e.g.*, I.C. §§ 36-1-2-10, -11, -13, -23 (providing that counties, cities, and towns are political subdivisions); *City of Huntington v. N. Ind. Power Co.*, 211 Ind. 502, 519, 5 N.E.2d 889, 896 (1937) ("[A] municipal corporation is a subordinate branch of the domestic government of the state . . . ."); *Applegate v. State ex rel. Pettijohn*, 205 Ind. 122, 125, 185 N.E. 911, 912 (1933) ("Counties are but subdivisions of the state . . . ."). As the constitutional officer vested with the executive power of the State and the duty to oversee the faithful execution of its laws, the Governor has an interest in these relationships between the public and the State's subdivisions.

**Second**, the legislature drafted Section 11.8 to apply to proposed annexations before an annexation ordinance had been adopted, preventing the use of the standard method of enforcing annexation law—remonstrances. When remonstrances are available to enforce annexation statutes, the Governor sees that the annexation laws as a whole (including the provisions setting out annexation requirements and the remonstrance provisions) are faithfully executed by allowing the remonstrance process to play out. But the Governor cannot take this route when, as here, the legislature precludes using the statutory remonstrance process to enforce an annexation statute. In short, the legislature drafted Section 11.8 to impact public rather than private relations at a chosen moment before anyone could remonstrate to enforce the statute, and it created a situation where the Governor was uniquely situated to exercise his executive power and enforce the statute. Thus, under these extraordinary circumstances, the Governor had enforcement authority under Section 11.8.

Based on this analysis, the Governor is a proper defendant here. The unique features of Section 11.8 show that the Governor enforces the statute pursuant to his general executive power and his duty to take care that the laws are faithfully executed. Because the Governor enforces

Section 11.8 under these rare circumstances, a judgment in Bloomington's favor here will provide redress to the city by removing the statute as a barrier to its proposed annexation.[6] Therefore, Bloomington's suit against the Governor easily presents the ripening seeds of a controversy that our Declaratory Judgments Act requires. We emphasize, however, that the Governor's argument will win in most cases—his general constitutional powers and duties will not establish enough of a connection to a statute to allow a suit like this one under most circumstances. But, given the one-of-a-kind statute involved, the Governor's constitutional authority and duty, the significant injury suffered by Bloomington, and the ability to afford it redress through declaratory judgment, we must reach this unusual result.

## C. Prudential concerns involved in the Governor's argument do not render this case nonjusticiable but, instead, compel us to reach the merits.

Notwithstanding our conclusions that the Governor enforces Section 11.8 and that Bloomington has satisfied the requirements of our Declaratory Judgments Act, we have stated that "prudential concerns may render a dispute nonjusticiable by the courts." *Berry v. Crawford*, 990 N.E.2d 410, 417 (Ind. 2013). So, we continue our analysis of the Governor's justiciability argument and consider the prudential concerns involved in this case.

Prudential concerns involving justiciability often arise in connection with our separation-of-powers doctrine, and we have cited these concerns to find an issue nonjusticiable in two recent cases. *See Citizens Action Coal. of Ind. v. Koch*, 51 N.E.3d 236, 241–243 (Ind. 2016) (declining to define

---

[6] Since the Governor enforces the statute and is a party to this lawsuit, he will be bound by this Court's judgment. If we declare Section 11.8 unconstitutional here, the Governor will be barred from enforcing it—even without an injunction. *See Dep't of Fin. Insts. v. Gen. Fin. Corp.*, 227 Ind. 373, 86 N.E.2d 444, 447 (1949) (citation omitted) ("When the law is settled it will be obeyed. It is therefore immaterial whether the proper proceeding is an application for a restraining order or a petition for a declaratory judgment. A final interpretation of the law in either form of proceeding would be binding upon these parties.").

legislative "work product" for purposes of Indiana's Access to Public Records Acts because doing so would have interfered with the internal workings of the legislative branch); *Berry*, 990 N.E.2d at 417–20 (declining to weigh in on the House of Representatives' discipline of some of its members because doing so would have interfered in the internal workings of the legislative branch). But prudential concerns need not be limited to those related to separation of powers. They may also relate to judicial economy and awareness of the pitfalls of a suggested course of action or its alternatives.[7] And here, we find four specific prudential concerns relevant, which, rather than rendering the case nonjusticiable, actually compel us to reach the merits.

First, requiring Bloomington to sue a different defendant would result in substantial delay and cost to taxpayers, but we would ultimately reach the same result as we do here: Section 11.8 would remain unconstitutional special legislation. In such a case, Bloomington and the Attorney General would present the same arguments regarding Section 11.8's constitutionality. *See* I.C. § 34-33.1-1-1; I.C. § 34-14-1-11. But everyone would just have to wait longer to have the dispute resolved, and, in the meantime, the Governor, Attorney General, Bloomington, and the courts would continue devoting scarce public resources to the dispute. In the end, with the same arguments before us, we would come to the same conclusion we do below—that Section 11.8 is unconstitutional special legislation—but only after everyone involved spent more time and public funds on the case.

---

[7] To be sure, the *Berry* Court held that "prudential concerns may render a dispute **nonjusticiable** by the courts." 990 N.E.2d at 417 (emphasis added). But it does **not** necessarily follow, as the dissent concludes, that prudence is strictly "a ground for **withholding** merits relief in cases otherwise within a court's jurisdiction." *Post*, at 7. Our consideration of prudential concerns is necessary to determine whether judicial action is **required** here. And, unfortunately, it is. The actions of the General Assembly stood in clear violation of the plain language of the Indiana Constitution. Those actions injured Bloomington. And a refusal on our part to address this injury—effectively creating a blueprint for the legislature to enact allegedly unconstitutional laws beyond judicial review—would do lasting damage to our system of government. Put differently, it would not be prudent.

Second, even if a hypothetical suit against someone else could bring some benefit, there is no other defendant to sue. A potential lawsuit against the suggested alternative defendants—landowners in the proposed annexation areas, the Monroe County Auditor, or the Monroe County Surveyor—would not be ripe because the proposed annexation ordinances have merely been introduced, not adopted. At this stage, it's unclear which, if any, of the proposed ordinances might have been adopted or what changes might have been made to them before adoption. Indeed, the City Council rejected the introduction of one proposed ordinance, and the majority of the ordinances that were introduced faced opposition from some council members. These uncertainties show that a suit against landowners or county officials would not have presented the required ripening seeds of a controversy.

Third, with no other defendant, Bloomington was forced to choose between (a) bringing this declaratory judgment action against the Governor, (b) violating the express terms of Section 11.8 by moving forward with its annexation, or (c) accepting that the legislature may have violated the Constitution in terminating the proposed annexation but that there was nothing Bloomington could do about it. We cannot approve of options (b) and (c). We share the concerns of our federal colleagues on the Sixth Circuit that, "[w]ere this action unavailable to [Bloomington], [it] would be unable to vindicate the alleged infringement of [its] constitutional rights without first violating an [Indiana] statute . . . ." *See Allied Artists Picture Corp.*, 679 F.2d at 666 n.5. Such an outcome would not only leave an alleged constitutional violation unaddressed but also create a blueprint for the legislature to enact allegedly unconstitutional laws beyond judicial review. Option (a), which Bloomington chose, and which we find permissible under these circumstances, is the only way forward here.

Fourth, and most importantly, having concluded that Bloomington's suit satisfies the requirements of our Declaratory Judgments Act,

separation-of-powers principles compel us to reach the merits of this case.[8] The dissent seems to view separation of powers as almost exclusively a prohibition on action—a command that we stay out of our co-equal branches' spheres. We wholeheartedly agree that this command is an extremely important part of our separation-of-powers doctrine. *See Boehm v. Town of St. John*, 675 N.E.2d 318, 322 (Ind. 1996) (citation omitted) (noting the risk that this Court could exceed the limits of its constitutional power in trying to keep another branch within its limits). But that's only half the story. While separation of powers requires restraint in many cases, it mandates judicial action in others.

As we've said before, "[t]he separation of powers provision exists not only to protect the integrity of each branch of government, but also to permit each branch to serve as an effective check on the other two." *State v. Monfort*, 723 N.E.2d 407, 413 (Ind. 2000). *See also Horner v. Curry*, 125 N.E.3d 584, 589 n.4 (Ind. 2019) (noting that separation of powers "works both ways" in terms of restraint and action). Thus, "in exercising the judicial function of government," the judiciary has the power and "the inevasible duty" in cases such as these "to declare legislative enactments void when that body has, in such an enactment, gone beyond or outside of the power granted to it." *Ellingham v. Dye*, 178 Ind. 336, 387, 391, 99 N.E. 1, 19, 21 (1912). *Accord Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–78 (1803) (noting that the federal legislature's powers are limited by the United States Constitution, "that an act of the legislature, repugnant to the constitution, is void," and that the judiciary has an obligation in cases and controversies before it to declare unconstitutional laws as such). In fact, the ability of an independent judiciary to check the other branches and declare statutes unconstitutional "was one of the central principles underlying the thinking of the framers of the Indiana Constitution and also the Constitution of the United States." *Monfort*, 723 N.E.2d at 413

---

[8] Article 3, section 1 of the Indiana Constitution provides that the "powers of Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial" and, thus, supplies the basis for our separation-of-powers doctrine. *See State v. Monfort*, 723 N.E.2d 407, 411 (Ind. 2000).

(relying on The Federalist No. 78, at 426, 428–29 (E.H. Scott ed., 1894), and *Noble Cnty. Council v. State ex rel. Fifer*, 234 Ind. 172, 181–82, 125 N.E.2d 709, 714 (1955)). And the ability of the judiciary to enforce separation of powers by checking the other branches is even more important in a case—such as this one—where a party alleges that a statute is unconstitutional special legislation because preventing special legislation "was the most potent argument" for adopting our current Constitution. *See Herman & Kittle Props., Inc.*, 119 N.E.3d at 80. *Cf. Berry*, 990 N.E.2d at 416–17 (relying on cases from other jurisdictions finding questions to be justiciable when legislative power granted in a constitution—as relevant here, the power to legislate—is limited by other constitutional provisions—as relevant here, a limitation on special laws).

In the end, while this Court exercises cautious restraint in checking the other branches under separation-of-powers principles, "we do not permit excessive formalism to prevent necessary judicial involvement. Where an actual controversy exists we will not shirk our duty to resolve it." *Boehm*, 675 N.E.2d at 322 (citation omitted). Bloomington's declaratory judgment action presents an actual controversy, and prudential concerns compel us to resolve it.

## II. Section 11.8 is unconstitutional special legislation.

Article 4, Section 23 of the Indiana Constitution places limits on special legislation, "which is a law that 'pertains to and affects a particular case, person, place, or thing, as opposed to the general public.'" *Herman & Kittle Props., Inc.*, 119 N.E.3d at 78 (citation omitted). In relevant part, it provides that "in all . . . cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." Ind. Const. art. 4, § 23. Bloomington contends that Section 11.8 violates Article 4, Section 23 because the legislature enacted Section 11.8 as a special law when it could have enacted a general law. The Governor admits that Section 11.8 is special legislation, but he defends Section 11.8's constitutionality, arguing that a general law could not be made applicable here given certain aspects of Bloomington's proposed annexation. In resolving this disagreement, we first review the framework for

determining a law's constitutionality under Article 4, Section 23, and then we apply that framework to the facts here.

## A. We recently clarified the framework for determining whether a statute violates Article 4, Section 23.

Just last year we examined the development of our Article 4, Section 23 jurisprudence and clarified the broad framework applicable to challenges under that provision. *See generally Herman & Kittle Props., Inc.*, 119 N.E.3d at 79–85. Under that framework, we begin our analysis by determining "whether the law is general or special." *Id.* at 82. Our next step depends on the answer to that initial question: "if the law is general, we decide whether it is applied generally throughout the State; but if the law is special, we decide whether the law is nevertheless constitutionally permissible." *Id.* As we move through this framework, we keep in mind the "overarching presumption that the statute is constitutional." *Id.* at 84. Since the parties here agree that Section 11.8 is special legislation, we focus the remainder of our review of this framework on the specific analysis involved in determining whether a special law is constitutional.

"[T]he constitutionality of special legislation hinges on the uniqueness of the identified class and the relationship between that uniqueness and the law." *Id.* A special law is permissible "when an affected class's unique characteristics justify the differential treatment the law provides to that class." *Id.* But a special law is **not** permissible "when there are no unique circumstances of an affected class that warrant the special treatment— meaning that a general law could be made applicable." *Id.*

Once a law is determined to be special, the parties bear alternating burdens in connection with the question of the law's constitutionality. Initially, the proponent of the law must "clear a low bar" by demonstrating a link between the alleged unique characteristics of the class covered by the law and the legislative fix—*i.e.*, the law's special treatment of that class. *Id.* If the proponent shows such a link, "then the opponent of the legislation must show why the specified class's characteristics are not defining enough to justify the special legislation,"

essentially challenging the uniqueness of the class covered by the special law. *Id.* at 85.

While the parties acknowledge this framework, they disagree as to whether it controls here or whether we announced a rule approving of special legislation regarding local government structure in *Dortch v. Lugar*, 255 Ind. 545, 266 N.E.2d 25 (1971). *See* Br. of Appellant, p. 30 (relying on *Dortch* for the argument that "the legislature can enact special laws directly affecting the structure of local governments"). Reading *Dortch* to control this case with a bright-line rule overextends its holding and overstates its position in our Article 4, Section 23 jurisprudence. Rather than announcing a bright-line rule, *Dortch* rejected a special-law challenge to the Unigov legislation, which affected only Indianapolis and Marion County, because the population-based limitation to the law's applicability had a rational relationship to the legislature's goal in passing the law. 255 Ind. at 552–53, 266 N.E.2d at 31–32. And, although we've noted that *Dortch* came to the correct result, *see Mun. City of S. Bend v. Kimsey*, 781 N.E.2d 683, 693 (Ind. 2003), its focus on the rationality or reasonableness of a law's population-based limitation on applicability has been "replaced by a more fine-tuned approach," *Herman & Kittle Props., Inc.*, 119 N.E.3d at 81. *See also Kimsey*, 781 N.E.2d at 688–89 (noting *Dortch*'s position in a line of cases focusing on this reasonableness inquiry but stating that "neither the 'per se' nor 'reasonableness' view of population categories is determinative of constitutionality"). Thus, *Dortch* does not control this case, and we apply the standard Article 4, Section 23 framework here.

### B. Bloomington's proposed annexation presents no unique circumstances justifying Section 11.8's special treatment.

The parties agree that Section 11.8 is special legislation, so our task is to determine whether it is nevertheless constitutional. As the proponent of the law, the Governor offers two aspects of Bloomington's attempted annexation as unique characteristics justifying Section 11.8's special treatment: (1) the speed of the process despite opposition to the proposed annexation; and (2) Bloomington's consideration, in drawing the

annexation areas, of waivers that precluded property owners from remonstrating against the annexation. We address each of these aspects in turn.

The first characteristic offered to support Section 11.8's constitutionality is the speed of Bloomington's proposed annexation, despite the opposition of some members of the community. This characteristic is linked to Section 11.8's legislative fix by the argument that the statute "allows for additional time to discern, plan, and implement any restructuring of local governments in Monroe County." Br. of Appellant, pp. 36–37. While this may be a sufficient link for our purposes here, Bloomington shows that its situation was not unique.

Had everything gone according to plan, Bloomington would have completed the statutory annexation process in 133 days. This length of time would have been in line with the detailed annexation schedule provided by statute, which allows annexations to take place in 120 days. *See* I.C. §§ 36-4-3-1.7, -2.1. Bloomington's 133-day schedule also would have been consistent with the City of Boonville's 2017–2018 annexations, which took 154 days. The speed of Bloomington's proposed annexation was not unique.

Similarly, opposition to Bloomington's proposed annexation did not render the situation unique. Bloomington presented evidence that affected landowners commonly oppose proposed annexations. The legislature has recognized this fact by providing for the statutory remonstrance process. *See generally* I.C. §§ 36-4-3-11, -11.2, -11.3, -13. And our caselaw shows that landowners do not shy away from challenging annexations. *See, e.g., Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597 (Ind. 2019). Bloomington's proposed annexation was not unique because some members of the community opposed it.

Because Bloomington's situation was not unique, the legislature could have enacted a general law that "allows for additional time to discern, plan, and implement any restructuring of local governments," Br. of Appellant, pp. 36–37, by increasing the statutory minimum amount of time before an annexation can occur. In fact, the legislature has done it before. *See* Pub. L. No. 248-1999, § 1, 1999 Ind. Acts 1722 (amending

Indiana Code section 36-4-3-2.1 and adding 90 days to the statutory minimum amount of time for an annexation). The pace of and opposition to Bloomington's proposed annexation does not support the constitutionality of this special legislation.

The second characteristic of the proposed annexation advanced to justify Section 11.8's special treatment is Bloomington's consideration of waivers of remonstrance, some of which were old and unrecorded,[9] in drawing its annexation areas to minimize opposition. The link presented between this characteristic and the legislative fix is that the legislature could have concluded that Bloomington was misusing the process and decided to halt the proposed annexation. But Bloomington again shows that its situation was not unique. Bloomington presented evidence that "remonstrance waivers are commonly discussed and incorporated into determining which areas are suitable to annex by the city or town." Appellant's App. Vol. XX, p. 186, ¶ 7. And Boonville's 2017–2018 annexation included many properties subject to waivers of remonstrance, some of which were old and long unrecorded. Because Bloomington's use of waivers of remonstrance was not unique, the legislature could have regulated the use of such waivers with a general law. Again, the legislature itself provides us with an example. *See* Pub. L. 257-2019, § 112, 2019 Ind. Acts 3419 (amending Indiana Code section 36-4-3-11.7 to limit the use of old and unrecorded waivers of remonstrance). Bloomington's use of waivers of remonstrance does not support Section 11.8's constitutionality.

In short, "there are no unique circumstances of [Bloomington's proposed annexation] that warrant the special treatment—meaning that a general law could be made applicable." *Herman & Kittle Props., Inc.*, 119 N.E.3d at 84. If the legislature were truly concerned with the pace and mood of Bloomington's proposed annexation or Bloomington's use of

---

[9] Under certain circumstances when extending sewer lines to property, a municipality must obtain a waiver of the right to remonstrate that runs with the property by binding successors in title of the property owner. I.C. § 36-9-22-2(c). This can sometimes lead to complications in the record-keeping process.

remonstrance waivers, that concern would have applied equally across Indiana. But the legislature did not pass a law prohibiting such activity by every municipality in the state. Instead, it singled out Bloomington. Under the circumstances here, that special treatment doled out by Section 11.8 is unconstitutional.

## Conclusion

This declaratory judgment action involves the following two issues: whether Bloomington properly sought declaratory relief from the Governor, and whether Section 11.8 is unconstitutional. We find that the Governor, in light of his constitutional authority and duty, does enforce Section 11.8 and Bloomington can bring its declaratory judgment action against him here because of the unique way in which the legislature drafted the statute, and because prudential concerns compel us to reach the merits. We also find that the legislature drafted Section 11.8 as a special law when a general law could have been made, so Section 11.8 violates Article 4, Section 23's limitation on special laws. Accordingly, we affirm the trial court's order granting summary judgment and declaratory relief to Bloomington and ruling that Section 11.8 constitutes impermissible special legislation in violation of Article 4, Section 23 of the Indiana Constitution.

Rush, C.J., concurs.
David, J., concurs in result.
Slaughter, J., dissents with separate opinion in which Massa, J., joins.

ATTORNEYS FOR APPELLANT
Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Kian J. Hudson
Deputy Solicitor General

Julia C. Payne
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Michael Rouker
City Attorney

Larry D. Allen
Assistant City Attorney
Bloomington, Indiana

**Slaughter, J., dissenting.**

Rejecting Governor Holcomb's argument that he is the wrong defendant in this declaratory-judgment suit, the Court holds that broad principles of standing do not apply here but prudential considerations do. I respectfully disagree on both points and would not give our state constitution's separation-of-powers mandate such short shrift under either doctrine. Our constitution confines courts to deciding cases over which they have jurisdiction. A justiciable case—one suitable for judicial resolution—has essential constitutional requirements like standing and nonessential considerations like prudence. Today's decision conflates the essential with the nonessential and thus erodes separation of powers. When a plaintiff lacks standing, any court action exceeds our constitution's grant of judicial power. Prudence, in contrast, presumes standing and permits a court to skirt a case over which it has jurisdiction. It does not authorize a court to proceed where jurisdiction is lacking. Simply put, Bloomington lacks standing here, which means the courts lack jurisdiction, and prudential considerations cannot fix this fatal flaw.

Although the Court invokes prudential concerns as an independent basis for reaching the merits, what animates the Court's analysis is its finding that the City has standing. Standing requires a plaintiff to prove injury, causation, and redressability in all cases, including actions for declaratory relief. The Court's contrary decision contravenes both our case law on declaratory judgments and our constitution's structural limits on judicial power. And the Court's rationale that a declaratory judgment against the governor on this record will redress the City's injury depends on a view of executive power that is deeply flawed. Under the Court's conception, the governor's duty to "take care" that the laws are faithfully executed is subject to judicial and legislative meddling. This interpretive approach to Article 5, Section 16 purports to empower the governor to enforce statutes over which he claims no authority when the courts say so—thus requiring that he defend unwelcome lawsuits—yet leaves him vulnerable to having his inherent powers rescinded or reassigned when the legislature says so. I cannot subscribe to a view of executive power in which the governor's "take care" authority serves as neither his shield nor his sword.

## I

Our constitution divides governmental powers among the legislative, executive, and judicial departments and forbids any official in one department from exercising the functions of another, except as the constitution expressly permits. See Ind. Const. art. 3, § 1. In allocating these powers, the constitution charges courts with exercising the "judicial power", *id.* art 7, § 1, which confides in courts the power to "resolv[e] real controversies". *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995). Stated differently, judicial power "is the power to resolve actual disputes between adverse parties by issuing binding decrees that pronounce the parties' rights and responsibilities and afford meaningful relief to the prevailing party." *Seo v. State*, 148 N.E.3d 952, 969 (Ind. 2020) (Slaughter, J., dissenting); see also *Pence*, 652 N.E.2d at 488 (contrasting "real cases" with "abstract speculation").

Standing protects separation of powers by preventing courts from deciding matters properly left to the executive or the legislature. *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019) ("[Standing] is a vital element in the separation of powers".); *Allen v. Wright*, 468 U.S. 737, 752 (1984) (Standing is "built on a single basic idea—the idea of separation of powers."). By requiring the plaintiff to prove actual injury, causation, and redressability, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), standing "limits the judiciary to resolving concrete disputes between . . . litigants". *Horner*, 125 N.E.3d at 589; *Seo*, 148 N.E.3d at 969 ("[S]tanding . . . ensures that a judicial decree redresses an actual injury attributable to the defendant's wrong."). These requirements are especially important where, as here, the legal challenge concerns the constitutionality of another branch's act. *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997) (describing "especially rigorous" standing analysis when a court decides whether action by another branch of government is unconstitutional). A rigorous approach to standing does not abdicate judicial duties but acknowledges the important though limited role of courts in our constitutional system. Employed correctly, standing confines courts to their proper role and thus protects the delicate balance among the three co-equal departments of state government.

Although the Court attempts to frame this issue as the Governor's "very specific, narrow attack on the justiciability of this case", *ante*, at 6, his litigation approach affects neither the outcome nor the analysis. Standing is a jurisdictional question. *Pence*, 652 N.E.2d at 488; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86, 103–04 (1998). Thus, we can, and should, raise questions of standing ourselves before reaching the merits. *Horner*, 125 N.E.3d at 592 (recognizing standing as a "threshold matter"); *Pence*, 652 N.E.2d at 487 (providing that "threshold question of standing" precedes merits discussion); see *Steel Co.*, 523 U.S. at 91–93 (discussing well-established duty to raise constitutional standing questions sua sponte). Despite the Court's proclamation that "broad principles of standing" do not apply here, the opposite is true. Broad standing principles apply in every case.

The Court shrugs off standing by invoking a view of the Declaratory Judgment Act that requires only a plaintiff's "substantial present interest in the relief sought" and the "ripening seeds of a controversy". *Ante*, at 7. Yet the Act speaks only to a court's ability to determine the legal rights between parties: "Courts . . . have the power to declare rights, status, and other legal relations". Ind. Code § 34-14-1-1. The Act is not an independent basis for exercising judicial power outside our limited constitutional role. And we have held as much. "To invoke the jurisdiction of the court under the declaratory judgment statute, there must be an actual, existing justiciable controversy between the parties". *City of Mishawaka v. Mohney*, 156 Ind. App. 668, 673, 297 N.E.2d 858, 860 (1973) (cleaned up).

A

Standing's first requirement is that the plaintiff suffer an injury. Without injury, there is no proper plaintiff, no actual controversy, and no jurisdiction. See *Pence*, 652 N.E.2d at 488. In a typical case, the injury has already occurred. But the Declaratory Judgment Act contemplates declaring parties' rights anticipatorily if the likelihood of breach and resulting injury, though not fully matured, are imminent—or, in the words of the Act, "whether or not further relief is or could be claimed." I.C. § 34-14-1-1. Shortly after the Act took effect, we explained that courts can adjudicate claims under the Act while staying within their

constitutional mandate by hearing cases where "an actual controversy exists between parties". *Rauh v. Fletcher Sav. & Tr. Co.*, 207 Ind. 638, 642, 194 N.E. 334, 336 (1935). And this was true although no wrong had yet occurred. *Id.* at 335. Thus, a plaintiff facing an imminent breach can bring a declaratory-judgment suit to define each party's rights before a breach occurs. And our Court, recognizing that breach and injury can be anticipatory, has refined our standing requirements for such suits but not eliminated them. Thus, *Rauh* explains that a plaintiff's claim under the Act requires the "ripening seeds" of a controversy, along with the plaintiff's "substantial present interest" in the relief sought. *Id.* at 335.

We used these very terms to discuss the plaintiff's injury in *Indiana Education Employment Relations Board v. Benton Community School Corporation*, 266 Ind. 491, 496–97, 365 N.E.2d 752, 754–55 (1977). *Benton* involved a school corporation's constitutional challenge to a statute permitting public employees to organize for collective-bargaining purposes, and the named defendants included executive-branch officials charged with enforcing the statute. *Id.* at 753. A labor union intervened and argued the school district was "neither injured" nor threatened "with injury sufficient to pose a justiciable controversy". *Id.* at 754. On appeal, we rejected the labor union's arguments and, on the merits, held the statute invalid. *Id.* at 760. In the process, we said that a plaintiff meets the injury requirement by showing the "ripening seeds of a controversy" in which it has a "substantial present interest". *Id.* at 754–55.

Here, the parties and the Court agree that the injury element is satisfied because the challenged statute prevents the City from carrying out its proposed annexation. Thus, the issue of the statute's constitutionality presents a sufficiently ripened controversy in which the City has a substantial present interest. But these two aspects of injury, while necessary, are not sufficient for courts to exercise jurisdiction under the Act. We must ask not only whether we have the correct plaintiff, but also whether we have the correct defendant.

## B

Standing's other two requirements—causation and redressability— focus on the defendant. Causation and redressability are, to be sure,

distinct elements, but they are two sides of the same coin. Taken together, they require that the plaintiff's injury be "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751.

Without explanation, the Court ignores causation and holds that a declaratory judgment here will redress the City's injury. It is not clear why the Court discusses redressability at all if it believes standing in declaratory-judgment actions requires only an injury. The Court offers no answer. But its analysis, in any event, fails as a matter of logic and law. Without knowing whether the defendant caused the harm, a court cannot determine whether the relief sought against the defendant will likely redress the plaintiff's harm. The Court's reliance on *Benton* does not support today's conclusion that general standing requirements of injury, causation, and redress do not apply to declaratory-judgment suits. We limited our discussion in *Benton* to injury not because it is the only requirement for maintaining a declaratory-judgment suit, but because injury was the only requirement at issue there. No one in *Benton* disputed that the named defendants enforced the statute or that a favorable judgment against them would redress the plaintiff's complained-of injury.

Elsewhere, we have rejected the view that some lawsuits have one set of justiciability criteria and declaratory-judgment suits have another, expressly requiring causation and confirming the necessity of a proper defendant in a declaratory-judgment suit. See *Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80 N.E.3d 164, 168 (Ind. 2017). In *McGuinness*, we applied our "general rule of standing", which includes the requirement of a "direct injury **as a result of the [defendant's] complained-of conduct**", and affirmed the dismissal of Union County's request for declaratory relief for lack of standing. *Id*. (emphasis added). What we held in *McGuinness* remains true today: the general requirements of standing—including causation—apply in declaratory-judgment suits.

The Act itself underscores the importance of the causation element. It speaks of "legal relations", I.C. § 34-14-1-1, and is concerned with "controversy between the parties". *Mishawaka*, 297 N.E.2d at 860. Declaring the legal relations between parties presupposes that one party

has caused, or is about to cause, harm to another party. Without a link between the defendant's conduct and the plaintiff's injury, the parties would have nothing of legal import between them for a court to adjudicate. Thus, the Act does not displace causation but rests on it.

C

Questions of causation and redressability here turn on whether the governor enforces the disputed statute. If he does not enforce it, he cannot cause the resulting injury, and a judgment against him will not provide redress. The Court addresses enforcement in connection with the supposed "uniqueness" of both the governor's constitutional role and the disputed statute. Yet the disputed statute mentions neither the governor nor any subordinate official accountable to him. The Court nevertheless holds that the statute somehow gives the governor a special, one-time-only enforcement power, relying on the statute's structure and the governor's constitutional duty to "take care that the laws are faithfully executed." Ind. Const. art. 5, § 16. The plainest reading of "the laws" is that it means **all** the laws, including the disputed annexation law. I agree with the Court that the governor enjoys inherent powers beyond those the legislature has conferred expressly. But the Court's application fails to embrace a robust view of this principle. To the contrary, the Court says today's "unusual result" is prompted by the "one-of-a-kind statute involved". *Ante*, at 15. In other words, the take-care clause is the expedient by which the Court makes the governor a defendant of last resort.

The implications of the Court's view are both troubling and far-reaching. Under the Court's conception, a governor's take-care power is not durable but fleeting. It exists only if the legislature has not stripped it from him. The governor has such authority, in other words, only if the legislature lets him keep it. If the legislature elects to confer enforcement authority in someone else—remonstrators, the attorney general, some other "enforcer"—then the governor has no such power. But that cannot be right. A constitutional power—one conferred by our organic law—is not subject to the legislature's whim. Just as constitutional rights are inviolable and not subject to legislative abrogation, the same is true of the constitutional powers conferred upon coordinate branches of state

government. The legislature can no more rescind or rewrite the governor's take-care power than the governor can repeal the legislature's power of the purse.

II

The Court's final foray into separation of powers holds that prudential concerns compel the Court to reach the merits of the City's claim. Yet invoking prudential concerns to justify awarding relief to the City has things backward. Justiciability presupposes that jurisdiction is secure and asks whether courts should nevertheless decline to reach the merits because of other policy considerations, like comity to another branch. As we have held, "prudential concerns may render a dispute nonjusticiable by the courts." *Berry v. Crawford*, 990 N.E.2d 410, 417 (Ind. 2013). "Prudence", then, is a ground for **withholding** merits relief in cases otherwise within a court's jurisdiction; it is not a basis for **awarding** relief in cases over which a court lacks jurisdiction. Prudence does not counsel that where jurisdiction is absent due to lack of standing, we should reach the merits anyway because the case is sufficiently important. The Court does not acknowledge this key difference, despite citing only cases where prudence rendered issues **non**justiciable. *Ante*, at 15–16. The problem with the Court's view of justiciability is that by throwing off the structural shackles that limit judicial power, we no longer confine ourselves to resolving actual disputes. Instead, we suffer the predictable mission creep of expanding our portfolio by issuing advisory opinions, in violation of separation-of-powers principles that keep courts—and all departments of state government—in their place.

Despite this threat to our constitutional structure, the Court says that separation-of-powers principles "compel us" to decide the merits of the City's claim. *Ante*, at 19. The Court also commends itself for its "cautious restraint" in enforcing these principles. *Ibid.* But there is nothing "restrained" about today's decision, which is a full-throated exercise of judicial power. Despite the Court's assurance that the duty to "stay out of our co-equal branches' spheres … is an extremely important part of our separation-of-powers doctrine", it justifies today's decision by observing that judicial self-restraint is only "half the story". *Ante*, at 18. That is

certainly true, and I do not quarrel with the Court's view that the story's other half is that the judiciary has an affirmative duty to curb unlawful action by the other branches. But our affirmative duty to ensure other branches stay within the law comes with its own set of principles—the first of which is to ensure that a case is properly before us. That is what separation of powers means. It is not a blank check giving courts unfettered authority to ensure other branches toe the line. We have our own, independent obligation to heed that line ourselves. Unfortunately, we cross that line today.

*     *     *

Under my proposed framework, the governor might well be a proper defendant in a declaratory-judgment action if his enforcement of an unconstitutional statute were actual or imminent. I could accept this outcome if required by a faithful application of our standing principles— all of them—and a fair reading of the take-care clause. The Court's approach, however, is neither. The Court says our standing requirements do not apply. And it fails to adopt a straightforward reading of the take-care clause. In one fell swoop, the Court assumes the power to hold the governor accountable for laws as it sees fit while hobbling the governor's exercise of his own take-care power.

Because our decision cannot be reconciled with the structural limits on judicial power compelled by Article 3, Section 1, and the governor's grant of power under Article 5, Section 16, I respectfully dissent.

Massa, J., joins.